THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD COLLINS (Impleaded) *et al.*, Defendants-Appellants.

First District (5th Division)    Nos. 77-1367, 77-1737 cons.

Opinion filed March 23, 1979.

414

James J. Doherty, Public Defender, of Chicago (Justine Knipper, Assistant Public Defender, of counsel), for appellant Richard Collins.

James J. Cutrone and John M. Cutrone, both of Chicago, for appellant Sandra Korb.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendants were convicted of conspiracy to commit theft. (Ill. Rev. Stat. 1973, ch. 38, par. 8—2.) Defendant Korb was also convicted of seven counts of forgery (Ill. Rev. Stat. 1973, ch. 38, par. 17—3), two counts of attempt theft (Ill. Rev. Stat. 1973, ch. 38, par. 8—4) and two counts of theft (Ill. Rev. Stat. 1973, ch. 38, par. 16—1). Collins was sentenced to five years probation while Korb was sentenced to three to nine years imprisonment on each count, each sentence to run concurrent. On appeal they both contend that the trial court erred in failing to suppress illegally seized evidence. Collins also contends that he was not proven guilty beyond a reasonable doubt while Korb also contends that the State failed to lay a proper foundation for the introduction of business records and that her sentence is excessive.

The following pertinent evidence was adduced at the hearing on defendants' motion to suppress evidence.

*Robert Hanssen, Chicago Police Officer*

At approximately 6 p.m. on October 26, 1973, he, Officer Sonnevelt and several other police officers went to apartment 26E at 6033 N. Sheridan Road with arrest warrants for defendants. The officers knocked on the door and when they "didn't find anyone," they went directly across the hall to apartment 26F which they had been using for surveillance purposes. Although the door to apartment 26F contained a "peephole" through which the front door to apartment 26E could be seen, it was impossible to see the back door of that apartment. The doors to apartment 26E exited on the same hallway. After waiting half an hour, he left the building and was standing on the sidewalk outside when he observed a cab arriving. From approximately four feet away, he saw Collins in the cab. The cab passed him and turned into the driveway at 6033 N. Sheridan Road, approximately 100 feet from where he was standing. He and Sonnevelt "briskly" returned to the building. Collins had apparently already entered the elevator when they returned so they proceeded to the 26th floor and knocked on the door to apartment 26E. When Collins opened the door they placed him under arrest. They searched and handcuffed Collins while standing in the "front vestibule of the apartment." Several feet from where he arrested Collins he observed a Polaroid photograph and a piece of paper on a room divider. He recognized the photograph as that of Terri Martin who had earlier told him about having her photograph taken. The piece of paper listed names of banks, some of which he recognized as being involved in the offenses he was investigating. Although he was not certain as to the evidentiary value of the list at that time, he took possession of both the list and the photograph.

He and Sonnevelt took Collins into the living room while Officer Blahusiak searched the apartment for Korb. Blahusiak reported that Korb was not in the apartment, but that he did find five checks on the bedroom floor. The officers decided to wait in the apartment for Korb to return. He and Collins went into the bedroom to watch television while the other officers waited in the living room. When the phone rang Collins answered it while Hanssen listened. He heard the caller tell Collins, "Hurry up. The bank closes at eight." Collins "mumbled" an answer and then said it must have been a mistake.

Later that evening Hanssen called the police station for a squadrol for Collins and after Collins was taken away, he and Officer Reilly remained in the living room for approximately an hour waiting for Korb. She never showed up.

On October 31, 1973, he filed an affidavit in support of an application for a search warrant for the same apartment. He, other officers and two

postal inspectors executed the warrant on November 1, 1973. Property was seized and inventoried, but was not returned to court.

*John Blahusiak, Chicago Police Officer*

He arrived at apartment 26E as Hanssen was arresting Collins in the vestibule. While searching the apartment for Korb he found five personal checks scattered on the bedroom floor next to the bed. He gathered them up, saw that they were personal checks and gave them to Hanssen.

Following presentation of evidence at the hearing, the trial court denied defendants' motion to suppress. The matter proceeded to trial, at which the following pertinent evidence was adduced.

*For the State*
   *John Guild*

In 1973 he and Sylvia Elickson lived together in an apartment at 6033 N. Sheridan Road in Chicago. He was acquainted with defendants Korb and Collins who lived together in apartment 26E of the same building. During a conversation in his apartment on July 23, 1973, Korb told him and Elickson that she had taken "three checks from Merrill, Lynch, Pierce, Fenner and Smith out of the mailbag at Wacker Drive" and that she wanted to use these checks to open three checking accounts, Korb showed him the checks and offered him $50 per account to open three accounts. The next morning he told Korb that he would open the accounts in return for "half the cash" and $50 per check. Korb agreed. On July 25, 1973, Korb brought three checks and an IBM typewriter to his apartment. Elickson was also present. Korb instructed him to open an account with an answering service for the purpose of receiving checks from the bank after he had opened an account. Korb also produced a gun registration card, an automobile registration card and a police traffic ticket book which had been taken from a police car. She used the IBM typewriter to complete the gun and automobile registrations and then printed the same names on the traffic tickets. When Collins entered the apartment, Korb told him to get a Polaroid camera from their apartment. Collins left, returned with a Polaroid camera and took several color photographs of Guild. Collins trimmed the finished photographs and pasted them to the gun registration cards. Korb completed three sets of identification each set consisting of a gun registration, an automobile registration and a traffic ticket. The identification cards were in the names of Richard Woods, George Hamilton and Leslie Bajak and were to be used in opening bank accounts.

Guild opened an account at an answering service in order to receive the "permanent checks" from the bank. On July 26, Korb gave him a Merrill, Lynch check made out to Richard B. Woods and a set of identification cards. Korb then accompanied him to the North Bank in

McClurg Court where he used the check and identification cards to open a checking account in the name of Richard B. Woods. When he returned to the car with "some temporary checks," Korb stated that she wanted "business size checks." He then returned to the bank, received "business size temporary checks" and gave them to Korb.

The following day Korb gave him a check and a set of identification cards for Leslie Bajak. After he endorsed the check in the name of Leslie Bajak, and Korb endorsed it in the name of Sylvia Bajak, he used the check to open an account in the Bajaks' names at the North Bank in Lake Point Towers. He received temporary checks and a blank signature card which he gave to Korb. After Korb signed "Sylvia Bajak" on the card, he returned it to the bank.

Korb next gave him a check payable to George Hamilton and another set of identification. He and Korb endorsed the check in the names of George and Marjory K. Hamilton. He then used this check and set of identification cards to open an account under the name of George Hamilton at the Marina City Bank. He again received temporary checks which he gave to Korb. Guild kept one temporary check from each of the three accounts and made withdrawals totalling approximately $450.

Guild saw Korb use a similar IBM typewriter to "type up checks" in her own apartment. During August 1973, he heard Korb state in the presence of Collins and Elickson, that, "Anyone who says crime does not pay is a fool."

On cross-examination, he admitted that he had been granted immunity from prosecution in return for his testimony. He stated that he destroyed the three sets of identification cards after using them.

*Carol Hensley*

She met Korb in August 1972, when Korb explained a "foolproof" system for cashing checks. Korb told her "to dress like I had money" and to become indignant if questioned. In October 1972, Korb gave her $100 to open a checking account at Lakeview Trust and Savings Bank in the name of "Rita Decker, Interior Decorator." Korb suggested this bank because "they didn't ask you for as much identification as the other banks." Korb also told her to obtain business checks because they could be cashed for larger amounts than personal checks. She did not sign any of the checks which she received from the bank.

*Sylvia Ludwig Elickson*

She met Korb, whom she knew as "Brandy," in October 1971 when they were employed together at a retail store in Chicago. From May 1973 until October 1973 she lived with John Guild in an apartment at 6033 N. Sheridan Road. When she had financial difficulties in November 1972 she contacted Korb for assistance. Korb offered to "give me a check to cash" and told her she could keep one-third of the proceeds. When Sylvia

expressed apprehension about being caught, Korb assured her that "You don't have to worry too much about it because you haven't had any previous offenses" and promised to provide bond money.

In January or February 1973 she rented a "Selectric" typewriter at Korb's request. The typewriter was delivered to her apartment. She forwarded the monthly invoices on the typewriter to Korb, paid the rental charges herself, and was reimbursed by Korb.

She and Korb were present in her apartment in July 1973 when Collins used a Polaroid camera to take pictures of John Guild "for identification pictures." Collins put the finished picture on an identification card. At this time Korb wanted Sylvia to have her picture taken in order to represent a person named Sylvia Lake, but she refused.

In July 1973 Korb drove her to the Gary-Wheaton Bank and gave her a check for more than $200. She was neither the maker nor the payee of this check. She presented the check to the teller and received cash which she gave to Korb. Korb gave her one-third of the cash. In October 1973 Korb drove her to the Naperville Bank and gave her a check payable to Charlotte Engler. She deposited this check and received over $200 in cash from the teller. She gave this cash to Korb and again received one-third of the total amount. Again in October 1973 Collins and Korb drove her to the Gary-Wheaton Bank where Korb, in the presence of Collins, gave her a check to cash. She objected because the payee was the same as on the check she had cashed at the Gary-Wheaton Bank in July. Korb assured her she would not be recognized. After presenting the check she was arrested for attempting to pass a forged check and was held in jail for two days until she was "bonded out" by Collins and Korb. Korb later told her not to appear in court on the matter.

She testified that she last saw Collins in January 1975 when he told her that she could be "offed" if she intended to testify against him.

*Susan E. Huskey*

A check payable to her and drawn by Richard B. Woods was cashed by someone other than her at the North Community State Bank where she maintained an account. Someone had endorsed the check in her name. She did not authorize anyone to cash this check and was not aware of its existence until notified by the bank.

*Charlotte Engler*

Two checks payable to her and drawn by Richard B. Woods and George Hamilton were cashed by someone other than her at the Bank of Naperville where she maintained an account. She did not authorize anyone to cash these checks.

*Helen Pugh*

She did not authorize anyone to endorse her name and place her

Chicago-Tokyo Bank account number on the back of a check drawn by Leslie Bajak and made payable to her. Someone other than she endorsed such a check and placed her account number beneath the endorsement.

*Marion Sloan*

She did not authorize anyone to endorse two checks made payable to her by Rita Decker and Leslie Bajak. Someone other than she endorsed two such checks and placed her Gary-Wheaton bank account number beneath the endorsement. She did not receive the proceeds of these checks.

*Rita Decker*

She did not open an account at Lakeview Trust and Savings Bank in the name "Rita Decker, Interior Decorator." She has never had an account at this bank.

*Leslie Bajak, Sylvia Bajak, George B. Hamilton, Marjory K. Hamilton, Richard B. Woods*

The parties stipulated that in 1973 these individuals had accounts with Merrill, Lynch, Pierce, Fenner and Smith. Although their names were signed on the backs of checks drawn by Merrill, Lynch and made payable to them, the signatures were not theirs. The Bajaks, the Hamiltons and Mr. Woods did not open, nor did they authorize anyone to open accounts in their names at, respectively, the North Bank at Lake Point Tower, Marina City Bank, or the North Bank at McClurg Court.

*Earl Kuntz*

He is president of Gillespie Telephone Answering Service which also receives business mail for clients. In August 1973 an account was opened with his service in the name of Richard B. Woods.

*Kathleen Schwab*

She is employed as a secretary at Electric typewriter Service and is in charge of rentals. On February 1, 1973, she rented an IBM Selectric Typewriter to Sylvia Elickson and sent monthly invoices to her. On August 8, 1973, a woman who said her name was "Brandy" Korb came to her office and purchased this typewriter for $389. She mailed Sylvia Elickson an invoice for the sale of the typewriter.

*Eugene Kostelnak, Investigator, Cook County State's Attorney's Office*

He personally took handwriting exemplars from Korb on February 11, 1974.

*Thomas Kessell*

He is a document examiner for the Chicago Police Department. He examined the handwriting exemplars which Eugene Kostelnak took from Korb and which he referred to as the "known sample." He compared them to the handwriting contained on various checks admitted into

evidence at trial and determined that the same person who executed the known samples wrote the signatures of Richard Woods, Rita Decker, Marjory Hamilton, Sylvia Bajak and Leslie Bajak on the various checks.

*Zora Bierman*

She is office manager and controller of Miss Page, Ltd., an employment agency. She prepared a payroll check for Dianne Greenwood and mailed it to her. She identified this check at trial. The check was drawn on the American National Bank.

*Dianne Greenwood*

She is the personnel manager of Miss Page, Ltd. She did not receive the payroll check prepared for her and mailed by Bierman. She did not authorize anyone to receive or cash this check for her.

*Edward Tomashewski*

He is a customer service representative at American National Bank. He testified that the Miss Page, Ltd. check issued to Greenwood was presented to him for payment on October 22, 1973. He identified Korb as the person making presentment. When he requested identification Korb gave him a California driver's license containing her photograph, a Cook County Hospital identification card and an Illinois passenger car registration. He telephoned the maker of the check to obtain a description of the payee. While he was on the phone Korb took the driver's license and the hospital card, stated that she was going to park her car and left the bank. He later contacted the police and identified a phtograph of Korb shown to him by Officers McGee and Daly as the woman who presented the check to him.

*Patrick Daly, Investigator, Chicago Police Department*

In October, 1973, he showed Edward Tomashewski eight or 10 photographs of white females, all of whom were approximately the same age and Tomashewski identified Korb from these photographs.

*Mayo Walcott, Executive Vice President and Cashier of the North Bank located in Lake Point Tower*

He identified Korb and testified that he knew her as Sylvia Bajak. He met Korb in August 1973 when she presented a check drawn on the North Bank account of Leslie and Sylvia Bajak. Although she presented no identification she returned signature cards for the account, claiming that she was Sylvia Bajak. She stated that she needed to cash a check for $400 in order to pay movers. The account had recently been opened with a check drawn by Merrill, Lynch, Pierce, Fenner and Smith, but the funds were not yet collected. When he authorized payment on the check, the $400 cash was delivered to Korb. The matter was again called to his attention when he was informed that the check used to open the Bajak account contained a forged endorsement.

*For the Defendants*
  *James Sternick, Assistant State's Attorney*
  John Guild was granted immunity from prosecution in return for his testimony against defendants.

OPINION

Defendants first contend that the trial court erred in failing to suppress evidence resulting from the arrest of Collins and the search, pursuant to an arrest warrant, for Korb. They initially argue that the complaints for the arrest warrants did not show probable cause and that the warrants were therefore improperly issued.

■■ Although it is true, as defendants argue, that an arrest warrant may be issued only upon a showing of probable cause (*Giordenello v. United States* (1958), 357 U.S. 480, 2 L. Ed. 2d 1503, 78 S. Ct. 1245) it does not necessarily follow that a demonstration of probable cause must be made in the complaint upon which the arrest warrant is issued. Section 107—9 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 107—9) which details the requirements for issuance of an arrest warrant does not require that the complaint show probable cause. Section 107—9 does, however, require that the judge issuing the arrest warrant examine the complainant or any witness under oath. Therefore, in issuing the arrest warrant the judge is not bound by the four corners of the complaint, but may base a determination of probable cause upon his required examination of the complainant or witnesses.

■■ The complaints for the arrest warrants in the present case were signed and sworn to by Officer Hanssen. Hanssen alleged in the complaints that Korb and Collins committed the offense of grand theft by deception on or about October 23, 1973, in Chicago, Illinois in that they "knowingly obtained by deception unauthorized control over United States currency of the value in excess of one hundred and fifty dollars, the property of Chicago-Tokyo Bank, with intent to deprive the said owner permanently of the use and benefit of said property." The complaints contain the names of the accused, the offense charged, the time and place of the offense, and the signature and oath of complainant. These complaints are clearly sufficient under section 107—9(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1973, ch. 38, par. 107—9(b)).

■■ Moreover, at the hearing on their motion to suppress, defendants presented no evidence indicating that the judge who signed and issued the arrest warrants had failed to examine the complainant or witnesses in compliance with section 107—9(a). On the contrary, the following order of court appears on each complaint following the text and the complainant's verification:

"I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probably cause for filing same. Leave is given to file said complaint. Warrant issued."

■ The above order was signed by the same judge who issued the arrest warrants for Korb and Collins. It is, therefore, clear that the judge issuing the arrest warrants properly examined the complainant to determine probable cause prior to issuing the warrants over his signature.

*People v. Waitts* (1967), 36 Ill. 2d 467, 224 N.E.2d 257, upon which defendants' rely, is factually distinguishable from the present case. In *Waitts* it was clear that the arrest warrant was issued solely upon the basis of a complaint which did not show probable cause on its face. The court held there that the complainant's grounds for believing defendant committed the crime must be made clear to the judge issuing the warrant. In the case at bar the arrest warrants were not issued solely on basis of the complaints and without an examination of the complainant. We, therefore, find defendants' argument to be without merit.

■ Defendants next contend that even if the arrest warrants were properly issued, the police exceeded their authority under those warrants and the fruits of the police actions should have been suppressed. In support of this contention defendants first argue that the police should have arrested Collins when they first observed him in the cab rather than waiting until he reached the apartment. The record, however, does not demonstrate that the police had an opportunity to arrest Collins before he reached apartment 26E. Officer Hanssen testified that Collins passed him and then exited from the cab approximately 100 feet from where Hanssen was standing. Hanssen "briskly" returned to the building, but Collins had apparently already entered an elevator. The record is devoid of any evidence indicating that the police purposely delayed or acted less than expeditiously in arresting Collins. Defendants' reliance upon *People v. Robbins* (1977), 54 Ill. App. 3d 298, 369 N.E.2d 577, and *United States v. Griffith* (7th Cir. 1976), 537 F.2d 900, is misplaced. In *Robbins* the police arrested defendant at the base of a stairway outside of his apartment, but then immediately returned with defendant to search his apartment. The court held that the search of defendant's room could not be justified as incident to the arrest. In *Griffith* the police seized defendant and placed him under arrest in his motel room. A paper sack lying on the bed was not within the area of defendant's immediate control at the time of his arrest. The police, however, allowed defendant to freely walk about the room to get dressed instead of bringing his clothes to him. The court held that by allowing defendant this freedom the police improperly attempted to create a pretext for examining the contents of the sack. We believe that

*Robbins* and *Griffith* are clearly distinguishable from the instant case and do not support defendants' argument.

■■ Defendants further argue that the police improperly seized the photograph and list of banks which were on the room divider. It is clear, however, that the police may lawfully seize articles in plain view which, due to the surrounding circumstances, they reasonably believe constitute evidence of criminal activity. (*Harris v. United States* (1968), 390 U.S. 234, 19 L. Ed. 2d 1067, 88 S. Ct. 992; *People v. Sprovieri* (1969), 43 Ill. 2d 223, 252 N.E.2d 531.) While arresting Collins, Officer Hanssen observed, in plain view several feet away, a photograph of Terri Martin and a list of banks. He had previously spoken with Martin regarding the case and she told him of having her photograph taken. Although he was not certain at the time as to the evidentiary value of the list of banks, he did, prior to seizing the list, recognize some of them as being involved in the offenses. Under these circumstances we believe the police acted reasonably in seizing the photograph and list of banks.

■■ ■ Defendants also argue that the police exceeded their authority under the arrest warrants when they seized five checks which later proved to be stolen from the mail while searching for Korb. They argue that the police had already determined Korb was not in the apartment and therefore had no right to search for her. However, even rudimentary police procedures require that a suspect's residence be eliminated as a possible hiding place before a further search is made. (*People v. Carter* (1971), 132 Ill. App. 2d 572, 270 N.E.2d 603, *cert. denied* (1972), 406 U.S. 962, 32 L. Ed. 2d 350, 92 S. Ct. 2065.) While conducting such a search for defendants, the police are not required to overlook items of evidence standing in plain view. (*People v. Barbee* (1966), 35 Ill. 2d 407, 220 N.E.2d 401.) In the instant case, the police were not absolutely certain that Korb was not in the apartment at the time of their entry and they clearly had a right to search for her on the premises. Officer Blahusiak discovered the five checks in the open on the floor while searching the bedroom for Korb. Under the circumstances Blahusiak could reasonably have believed these checks constituted evidence of a crime.

Defendants next contend that the trial court erred in failing to suppress evidence resulting from a search of apartment 26E on November 1, 1973, pursuant to a search warrant. In support of this contention defendants first argue that Officer Hanssen's affidavit supporting the search warrant contained conclusions as to criminal activity rather than facts showing probable cause.

■■ It is clear that "[s]earch warrants must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion." (*People v. Garcia* (1975), 27 Ill. App. 3d 396, 400, 326 N.E.2d 497, 501.) A search

warrant should not be invalidated through hypertechnical scrutiny. (*People v. Dillon* (1970), 44 Ill. 2d 482, 256 N.E.2d 451.) In the present case Hanssen's affidavit stated that Terri Martin and Mary Emb each related receiving "forged checks" from Korb, while Terri Aleshire related that she had known Korb to provide "forged checks" for fraudulent passing. Defendants argue that the use of the term "forged" is a legal conclusion rather than a statement of fact. Nevertheless, we believe common sense requires that usage of the term "forged checks" by three informants who admittedly participated in passing such checks was sufficient to establish probable cause. To accept defendants' argument here would be to apply an overly technical standard of review.

■■ In addition, defendants argue that the affidavit contains the unreliable hearsay statements of Martin, Aleshire and Emb. However, it is clear that hearsay information set forth in an affidavit may be sufficient to support issuance of a search warrant as long as the affidavit contains a substantial basis to indicate the credibility of the hearsay information. (*Jones v. United States* (1960), 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725; *People v. Williams* (1963), 27 Ill. 2d 542, 190 N.E.2d 303.) In the present case the assertions made by the informants constituted admissions of implication in a crime. Such an implication has been held to be sufficient basis for crediting hearsay information in an affidavit. *People v. Saiken* (1971), 49 Ill. 2d 504, 275 N.E.2d 381, *cert. denied* (1972), 405 U.S. 1066, 31 L. Ed. 2d 796, 92 S. Ct. 1499.

Defendants also argue that even if the affidavit had been sufficient to provide probable cause, the search warrant issued was a general warrant and therefore illegal. Our supreme court, in determining whether the description in a search warrant was sufficient, stated:

"A minute and detailed description of the property to be seized is not required, but the property must be so definitely described that the officer making the search will not seize the wrong property." (*People v. Prall* (1924), 314 Ill. 518, 523, 145 N.E. 610, 612.)

In determining the adequacy of a description we must avoid placing an emphasis upon technical detail at the expense of common sense. (See *People v. Williams* (1968), 40 Ill. 2d 522, 240 N.E.2d 645, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004.) Moreover, where property of a specified nature, rather than particular property, is to be seized a description of its general characteristics is sufficient. (*People v. Curry* (1973), 56 Ill. 2d 162, 306 N.E.2d 292.) In *Curry* our supreme court held that under the facts of that case a description was sufficient where the police officer was ordered to search for material "dealing with a 'call girl' operation." 56 Ill. 2d 162, 167, 306 N.E.2d 292, 295.

In the present case the search warrant issued on October 31, 1973, commanded the police to:

"Seize any negotiable instruments such as checks not in the name of Sandra Korb, all typewriters, and bogus identification; and other evidence of forgery which have been used in the commission of or which constitute evidence of the offense of forgery."

■■ We do not agree with defendants that this warrant allowed the police to use their unfettered discretion in determining which objects to seize. Certainly the terms "typewriters" and "bogus identification" were sufficiently specific and "other evidence of forgery" meets the requirements of *People v. Curry* (1973), 56 Ill. 2d 162, 306 N.E.2d 292.

■■ Defendant Collins next contends that he was not proven guilty beyond a reasonable doubt of conspiracy to commit theft. He argues that the evidence does not support his knowing participation in a conspiracy to commit theft. The requisite elements of conspiracy are an agreement to commit an offense with an intent that the offense actually be committed, and the commission of an act in furtherance of the agreement by a conspirator. (Ill. Rev. Stat. 1973, ch. 38, par. 8—2.) A conspiracy may be proved by "inference from conduct, statements, facts and circumstances which disclose a common design on the part of the accused and others to act in pursuance of a common criminal purpose." (*People v. Brinn* (1965), 32 Ill. 2d 232, 244-45, 204 N.E.2d 724, 732, *cert. denied* (1965), 382 U.S. 827, 15 L. Ed. 2d 72, 86 S. Ct. 62.) As this court stated in *People v. Graham* (1971), 1 Ill. App. 3d 749, 752, 274 N.E.2d 370, 372:

"It is recognized that since the very nature of the crime of conspiracy is clandestine there would be no witnesses to the agreement, and it has been determined that failure of proof of verbal or written communication is not fatal to a conviction, where the acts themselves, subsequent to the alleged conspiracy, inferentially establish the existence of an agreement. (*People v. Edwards*, 74 Ill. App. 2d 225, 219 N.E.2d 382; *People v. Brinn*, 32 Ill. 2d 232, 204 N.E.2d 724.) It is, therefore, the conduct of the parties which may determine whether or not the co-parties were in fact co-conspirators."

■■ We will reverse a conviction only where the evidence is so improbable as to justify a reasonable doubt as to guilt. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) In the present case John Guild testified that on July 25, 1973, Collins took his photograph with a Polaroid camera at Korb's request. Collins pasted finish photographs on gun registration cards which Korb had previously completed in the names of Richard Woods, George Hamilton and Leslie Bajak. Elickson corroborated Guild's testimony and added that Korb and Collins also wanted to take her photograph in order to prepare identification in the name of Sylvia Lake. Elickson testified that Collins wanted her to represent Sylvia Lake in order "to open up the accounts." Guild later used

the Bajak identification prepared by Collins in order to open an account at North Bank in the names of Sylvia and Leslie Bajak. A check drawn on this account was later presented to the Chicago-Tokyo Bank by an unidentified woman. Elickson further testified that in October 1973 Collins drove her to the Gary-Wheaton Bank. In the presence of Collins, Korb assured her that she would not be caught attempting to cash a check at the bank. Elickson was arrested at the bank and Collins later posted bond for her. We believe the evidence adduced at trial clearly established that Collins was a knowing participant in the common plan to commit theft and, accordingly, we will not reverse the jury's finding of guilt.

Defendant Korb next contends that the State failed to lay a proper foundation for the introduction of certain documents under the business records exception to the hearsay rule. The evidence she objects to consisted of certain documents pertaining to her personal bank accounts, a record of medical charges and payments from her personal physician, an application for a telephone answering service, typewriter rental invoices and a typewriter rental agreement. Korb argues that the State failed to demonstrate that it was in the ordinary course of business to prepare such records at or near the time of the transactions documented.

Section 115—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1973, ch. 38, par. 115—5(a)) provides for the admission of business records as follows:

> "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.
>
> All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

■■ In the present case the State showed only that the documents were prepared by the banks, the physician, the answering service and the rental company in the ordinary course of business and were true and accurate records. The State failed, however, to meet the additional requirement of proving that the ordinary course of business for each entity was to prepare such a record at or near the time of the transaction. Absent a proper foundation, the records should not have been admitted.

■■ However, we will not reverse a judgment of conviction merely because error has been committed, unless it appears that justice has been

denied or that the jury verdict may have resulted from such error. (*People v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.) Upon a careful review of the record we are convinced that the evidence of Korb's guilt was so overwhelming that the error complained of was harmless beyond a reasonable doubt and that the jury verdict would have been the same even if the records had been excluded.

Defendant Korb finally contends that her sentence of three to nine years is excessive. It is clear that the imposition of sentence is a matter of judicial discretion and that, absent an abuse of that discretion, the sentence imposed by the trial court will not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A decision as to the proper sentence requires an analysis of many factors, including defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.

■■ The record here indicates serious and continuing criminal conduct on Korb's part. Not only did she devise and practice a scheme to defraud various banks and steal from numerous individuals, she also actively recruited others to join in her illicit efforts. Moreover, Korb's attitude toward her conduct was indicated when she told Guild that "anyone who says crime does not pay is a fool." The fact that she is a college graduate and has been gainfully employed may be considered, but does not mandate probation or a reduction in the sentence. Considering the nature of Korb's conduct and her apparent attitude, we do not believe the trial court abused its discretion in imposing sentence.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.